UNITED STATES DISTRICT COURT
for the
WESTERN DISTRICT OF NEW YORK

————————————————————————————————————————

| | | |
|---|---|---|
| JUAN A. LABOY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ONTARIO COUNTY, NEW YORK, | ) | Civil Action #: 14-CV-6086 |
| | ) | |
| Defendant. | ) | |

————————————————————————————————————————

**AMENDED COMPLAINT**
**(Jury Trial Requested)**

————————————————————————————————————————

NOW, comes the Plaintiff, complaining of the above-named defendants by his attorney, David M. Abbatoy, Jr., Esq., and alleges as follows:

## I. PARTIES

1.      The plaintiff, Juan A. Laboy, is a natural person and a citizen of the United States and currently resides in Ontario County, New York.

2.      Defendant Ontario County, New York (hereinafter "Defendant County") is a public municipal entity with its principal offices located in Canandaigua, New York.

3.      Office of Sheriff, County of Ontario (hereinafter "Sheriff's Office") is the professional municipal police organization of the Defendant County.  It is authorized and required to enforce state laws and to abide by the dictates of the state and federal constitutions.

1

4.       Defendant County is also the employer of the individual defendants from the Sheriff's Office named herein and is a proper entity to be sued under 42 USC § 1983.

5.       Defendant County is the legal entity responsible for itself and the Sheriff's Office.

6.       At all times relevant, Sheriff Paul C. Provero was a citizen of the United States and resident of the State of New York.  Sheriff Provero is head of the Sheriff's Office, employed by the Defendant County, and was acting under color of state law at all times relevant herein.

7.       As the head of the Sheriff's Office, Sheriff Provero both exercised and delegated his municipal final decision-making power to other individuals and deputies within the Sheriff's Office.

8.       Upon information and belief, Sheriff Provero (together with other subordinates unknown to plaintiff at this time) also trained and supervised the deputies named in this complaint.

9.       At all times relevant, Deputy Rebecca Edington was a citizen of the United States and a resident of the State of New York and was acting under color of state law in her capacity as a law enforcement officer employed by the Sheriff's Office. :

10.       At all times relevant, Deputy Nathan Bowerman was a citizen of the United States and a resident of the State of New York and was acting under color of state law in his capacity as a law enforcement officer employed by the Sheriff's Office.

11.       At all times relevant, Deputy Patrick Fitzgerald was a citizen of the United States and a resident of the State of New York and was acting under color of state law in his capacity as a law enforcement officer employed by the Sheriff's Office.

12.       Defendant County, the Sheriff's Office, and Sheriff Provero are properly sued under 42 USC § 1983 for their delegated deliberately indifferent unconstitutional decisions, policies, practice, habits, customs, usages, training and derelict supervision, ratification, acquiescence and

intentional failures which were the moving forces in the complained of constitutional violations and resulting injuries.

## II. JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 USC § § 1331, 1341 & 1343 because it is filed to obtain compensatory for the deprivation, under color of state law, of the right of a citizen of the United States secured by the federal constitution and federal law pursuant to 42 USC § § 1981 and 1983.

14.     Jurisdiction supporting plaintiff's request for attorney's fees is conferred by 42 USC § 1988.

15.     Venue is established pursuant to 28 USC § 1391 by the residence of the parties and because the events giving rise to plaintiff's claims occurred in this judicial district.

## III.  FACTUAL BACKGROUND

16.     On August 1, 2010 at approximately 11:15 am, the Sheriff's Office received a request to respond to 2171 State Route 14 in the Town of Phelps to take a report regarding "family issues".

17.     At all time relevant herein, 2171 State Route 14 was plaintiff's home.

18.     At that time a sheriff's deputy took a written complaint from Jomaira Rojas for Harassment in the Second Degree, a non-criminal violation-level offense in the State of New York (*see* Penal Law § 240.26).

19.     Ms. Rojas spoke no English.  She communicated to the police exclusively through an interpreter.

20.    Ms. Rojas accused her common-law husband, the plaintiff Mr. Laboy, of pushing her during an argument.

21.    Ms. Rojas gave a verbal statement to the responding officers who, through a translator, reduced the complaint to writing.

22.    Mr. Laboy was not present when the police took the written complaint, but the police asked Ms. Rojas to contact the police if he came home again.

23.    Pursuant to the New York Criminal Procedure Law, the police are not authorized to arrest a person for a violation-level offense that did not take place in the officer's presence (CPL § 140.10[1][a]).

24.    However, no one ever obtained a warrant for Mr. Laboy's arrest.

25.    Hours later, at the beginning of her shift, Deputy Edington learned from her superiors during roll-call that there had been "possible family trouble" and a "verbal altercation" at Mr. Laboy's residence earlier in the day and that she might have to respond to the residence later that night.

26.    Although Deputy Edington had not seen the signed harassment complaint, even before her encounter with Mr. Laboy later in the day, she "knew that there was going to be an arrest for a violation at the least".

27.    She was told by her superiors and others within the Sheriff's Office "that we had a signed information for a harassment violation arrest, and to be aware there was another deputy that had the information in their vehicle".

28.    At approximately 6:45pm, Deputy Edington was dispatched to 2171 State Route 14 (Mr. Laboy's home), where Ms. Rojas had given the statement earlier in the day.

29.     At the time of the dispatch, and at all other relevant times, Deputy Edington was aware that 2171 State Route 14 was Mr. Laboy's home.

30.     Deputy Edington put on her overhead lights and sirens and rushed to the residence.

31.     Deputies Bowerman and Fitzgerald were also dispatched to the scene and they arrived in cars separate from Deputy Edington.

32.     Deputy Edington could hear their sirens when she approached the destination.

33.     When Deputy Edington arrived, Ms. Rojas was standing outside of the residence.

34.     Deputy Edington tried to communicate with Ms. Rojas, but she did not speak any English and Deputy Edington did not speak any Spanish.

35.     Deputy Edington was asking Ms. Rojas if Mr. Laboy was inside, whether he had hit her, whether there were any weapons, or whether Ms. Rojas had any injuries, but Ms. Rojas was unable to answer any of Deputy Edington's questions.

36.     As a result, Deputy Edington and Ms. Rojas were completely unable to communicate with each other.

37.      Having failed to ascertain any evidence about alleged criminal activity, Deputy Edington then attempted to gain entry to the house.

38.     At the time of the attempted entry, Deputy Edington had no rational basis to believe that Ms. Rojas had authority to grant access to the home.

39.     Deputy Edington made no attempts to verify that Ms. Rojas had authority to grant access to the home.

40.     At the time of the attempted entry, Deputy Edington had no rational basis to believe that Ms. Rojas had authority to permit the police to arrest Mr. Laboy within his home.

41.     At the time of the attempted entry, Deputy Edington had not attempted to gain Ms. Rojas' consent to enter the residence, nor could she have done so because of the language barrier between the two people.

42.     At the time of the attempted entry, there was no rational basis to ask for Ms. Rojas' consent to enter the residence.

43.     At the time of the attempted entry, Ms. Rojas no one had explained to Ms. Rojas that she was not required to permit entry into the home, nor was she provided with a written waiver explaining the same.

44.     At the time of the attempted entry, Deputy Edington had no rational basis to believe that an emergency situation or hot pursuit required her immediate entry into the home.

45.     Again, although Ms. Rojas could not speak any English, Deputy Edington asked her to open the door to the house.

46.     Ms. Rojas complied with the deputy's order and unlocked the two doors leading into the residence.

47.     When Deputy Edington entered the residence, she drew her .40 caliber handgun from its holster and began to yell for Mr. Laboy to come out because he was under arrest.

48.     At that time, Mr. Laboy was asleep in his bed, having went to bed early to rest himself for his early-morning job as a bricklayer.

49.     After announcing herself five times, the deputy alleged that she received the response "fuck you" from the back of the home.

50.     This response of "fuck you" constituted a revocation of whatever possible permission Deputy Edington had to be inside of the residence.

51.     Instead of leaving the home, Deputy Edington put her finger on the trigger of her weapon, approached the bedroom, and kicked open the door.

52.     At the trial that would ultimately result from Mr. Laboy's forthcoming arrest, Deputy Edington explained her decision to take this course of action as follows:

> "I was already engaged with the investigation.  I knew that he was now inside, after he acknowledged that he was inside and I heard him.  He's behind closed doors.  It's officer safety.  I'm not going to withdraw and leave the house and wait for backup to come 'cause I don't know what weapons he has.  I didn't know if he had a gun in back.  I didn't know if he was waiting right inside that door for me.  So without knowing that, if here was going to be an ambush situation, I proceeded down towards the bedroom to make eye contact with the suspect".

53.     Deputy Edington entered the bedroom and, with her finger still on the trigger of her weapon, pointed it at Mr. Laboy, who was lying in his bed.

54.     Deputy Edington ordered Mr. Laboy to stand up because he was under arrest.

55.     Mr. Laboy complied with the request, stood up, put his hands behind his back, and said to the deputy "point [the gun] away from me or I will take it", but made no physical threats against the officer.

56.     When the deputy saw that Mr. Laboy was wearing only his underwear (and was clearly unarmed), she holstered her gun and took out her taser, pointing it at Mr. Laboy.

57.     Mr. Laboy complied in allowing his hands to be cuffed behind his back, but when he did so, the deputy slammed him against the wall repeatedly.

58.     Mr. Laboy fell onto the ground and the deputy picked him up by his arm, performing what she referred to as an "iron wrist drag".

59.     The pressure on Mr. Laboy's wrists causes scrapes, bruising, and swelling.

60.     Deputy Edington employed repeated "knee strikes" against Mr. Laboy's legs.

61.     The deputy employed a pressure tactic known as a "mandibular angle", pressing her hand against Mr. Laboy's head, neck, and throat to control his body, all while he was still handcuffed.

62.     The deputy repeatedly pushed Mr. Laboy against the wall.  On one occasion, Mr. Laboy's face hit a nail that was protruding from the wall causing a gash on his face and also causing his head to jerk back, striking the deputy in the nose.

63.     After having been struck in the nose, the deputy turned Mr. Laboy's body around, kicked him in the groin and pushed him onto the bed.

64.     Then, Deputy Edington dragged him off of the bed by the handcuffs and kneeled on his back until Deputies Bowerman and Fitzgerald arrived.

65.     Deputies Bowerman and Fitzgerald took physical custody of Mr. Laboy and locked him in the backseat of their police cruiser for transport.

66.     The deputies refused Mr. Laboy's request to put on his pants before being taken outside.  Instead, they brought him outside handcuffed and in his underwear.

67.     While Mr. Laboy was seated in the backseat of the police cruiser, Deputy Edington approached him, gave him the middle finger, and shouted "fuck you" at him.

68.     Upon information and belief, thereafter, Deputies Edington, Bowerman, and Fitzgerald completed official accusatory paperwork and criminal complaints and gave sworn testimony against Mr. Laboy on several occasions accusing him of the following crimes:

> ➢ Assault in the Second Degree (Penal Law § 120.05[3]);

> ➢ Obstructing Governmental Administration in the Second Degree (Penal Law § 195.05); and

➤   Resisting Arrest (Penal Law § 205.30).

69.     With the full cooperation and involvement of the deputies (principally Deputy Edington) Mr. Laboy was ultimately indicted and tried in Ontario County for these alleged crimes.

70.     Ontario County Indictment # 10-07-152 accused Mr. Laboy of "forcibly resisting his lawful arrest for Harassment in the Second Degree".

71.     Mr. Laboy was not charged with harassment or any other offense.

72.     There was not probable cause to believe that Mr. Laboy had committed any other state or federal crime at the time of his arrest.

73.     Each of the crimes that the deputies accused Mr. Laboy of required proof that the officers were attempting to execute a lawful arrest.

74.     The deputies made these accusations knowing that they were not engaged in a lawful arrest of Mr. Laboy for a violation level-offense.

75.     The deputies knew that the complaint was only for a violation-level offense not committed in their presence and that they were not authorized to arrest plaintiff.

76.     Deputy Edington made up her mind that she was going to arrest Mr. Laboy long before she even entered the home because she believed, "[w]e already had a signed information so, regardless, he was going to be arrested".

77.     The deputies knew that even if there was probable cause to believe Mr. Laboy had committed a crime (and not a non-criminal violation) they did not have a warrant to arrest Mr. Laboy in his home, as was otherwise required by the federal constitution.

78.     It is part of the policy and practice of the Sheriff's Office and the named defendants to effectuate arrests for violations that were not committed in their presence and without probable cause.

79.     Indeed, Deputy Edington conceded in her sworn trial testimony that such arrests are a common-place occurrence in Ontario County.

80.     Deputy Edington further stated under oath that she believed it was in her discretion to either arrest without a warrant or to issue an appearance ticket.

81.     The county prosecutor confirmed in his oral argument to the court that arrests like Mr. Laboy's are typical in Ontario County by saying:

> "There's no requirement and [defense counsel] hasn't identified any requirement, he cannot identify any requirement, that there be a warrant or information filed in court.  In fact, that would be contrary to what we know happens on these harassment arrests every day in that they're arrested, they're either given appearance tickets or taken and arraigned and an order of protection before there's a filing.  There's no requirement that any of that occur"

82.     The county prosecutor further confirmed at sentencing that numerous top officials within the sheriff's department had attended the trial in a show of support for the propriety of Deputy Edington's actions:

> "[t]he support for Deputy Edington was apparent at every turn with her extended law enforcement family with her throughout this trial.  At times Sheriff Povero, Undersheriff Tillman, Lieutenant Falkey, Lieutenant Storer, Sergeant Colburn, Sergeant Cirencione, Deputies Dill, Bowerman, Fogarty, Nelson, Fitzgerald, Taylor and so many others were here to support her because they knew she was doing the right thing, and they knew she was doing it the right way"

83.     Deputy Edington testified at trial against Mr. Laboy in support of the charged offenses.

84.     Deputy Edington claimed at trial that Mr. Laboy had injured her while he was resisting a lawful arrest.

85.     Mr. Laboy retained Jason M. Housel, Esq., to defend him against the charges.

86.     The matter ultimately proceeded to a jury trial in Ontario County.

87.     At trial, there was no dispute that Deputy Edington went to Mr. Laboy's home with the intention of arresting him for a violation-level offense.

88.     There was also no dispute at trial that Deputy Edington arrested Mr. Laboy in his home without a warrant.

89.     However, with defense counsel's consent, the trial judge instructed the jurors that a lawful arrest was simply one that took place within the arresting officer's geographical jurisdiction.

90.     The jurors were not instructed at all regarding any other definition of a lawful arrest.

91.     The jurors were not informed that an officer could not arrest for a violation-level offense that was not committed in her presence.

92.     The jurors were not informed that an officer could not arrest a person in his home without a duly issued warrant.

93.     There was no debate at trial that Mr. Laboy had been arrested in Ontario County.

94.     On February 18, 2011, the jury convicted Mr. Laboy of all of the charges against him.

95.     On February 25, 2011, the trial judge sentenced Mr. Laboy to six years of incarceration, plus three years of post-release supervision on the assault charge, together with concurrent one year terms of incarceration on the remaining charges.

96.     Mr. Laboy appealed his conviction and argued that there was insufficient evidence of the crimes against him because there was no proof that the arresting officers had engaged in a lawful arrest.

97.     On February 14, 2014, the Appellate Division, Fourth Department reversed Mr. Laboy's conviction on the grounds of legal insufficiency.

98.     The Fourth Department held in relevant part that:

> "We conclude that the evidence is legally insufficient to establish that the deputy's arrest of defendant was lawful inasmuch as the deputy lacked reasonable cause to believe that defendant committed an offense in her presence (*see* CPL 140.10[1]). Because the arrest was not authorized at its inception, the evidence is legally insufficient to support the conviction of assault, obstructing governmental administration, and resisting arrest (*see People v Perez*, 47 AD3d 1192, 1192-1194), and reversal is therefore required"

99.     As a result of the Appellate Division's order, Mr. Laboy was released from state prison on February 20, 2014, after having spent six months in the Ontario County Jail, followed by three years in state prison.

100.    While in prison he suffered various physical, mental, and emotional injuries, loss of reputation, loss of income, and other monetary and non-monetary damages.


### IV.  CLAIM FOR RELIEF

(Violation of 42 USC § 1983 -- Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision in Violation of the Fourth, Fifth and Fourteenth Amendments)

101.    Plaintiff incorporates all of the foregoing allegations as if fully set forth herein.

102.     Plaintiff brings this claim under 42 USC § 1983 against the Defendant County.

103.    The named defendants are persons for the purposes of 42 USC § 1983.

104.    The named defendants to this claim were at all relevant times acting under the color of state law.

105.    At the time of the conduct complained of herein, plaintiff had clearly established rights: (a) to be secure in his person from unreasonable seizure through excessive force under the Fourth Amendment; (b) the right to bodily integrity and to be free from excessive force by law enforcement under the Fourteenth Amendment; (c) the right to be prosecuted only upon an indictment lawfully obtained under the Fifth Amendment; and (d) the right to be free from malicious prosecution under the Fourth, Fifth, and Fourteenth Amendments.

106.    Defendant County and Sheriff Provero knew or should have known of these rights at the time of the complained of conduct as they were clearly established that that time.

107.    The acts or omissions of these Defendants, as described herein, deprived plaintiff of his constitutional and statutory rights and caused him other damages.

108.    Defendants are not entitled to qualified immunity for the complained of conduct.

109.    Defendant County and Sheriff Provero were, at all relevant times, policy makers for the County and the Sheriff's Office, and in that capacity established policies, procedures, customs and/or practices for the same.

110.    These defendants developed practices and maintained policies, procedures, customs, and/or practices exhibiting deliberate indifference to the constitutional rights of citizens, which were moving forces behind and proximately caused the violations of plaintiff's constitutional and federal rights as set forth here and in the other claims, resulted from a conscious or deliberate choice to follow a course of action from among various available alternatives.

111.    Defendant County and Sheriff Provero have created and tolerated and developed long-standing, department-wide customs, law enforcement related policies, procedures, customs, practices and/or failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference to the constitutional rights of plaintiff and the public.

112.    In light of the duties and responsibilities of those law enforcement officers who participate in arrests and preparation of police reports of alleged crimes, the need for specialized training and supervisions is so obvious, and the inadequacy of training and/or supervision is so likely to result in the violation of constitutional and federal rights such as those described herein that the failure to provide such specialized training and supervision is deliberately indifferent to those rights.

113.    The deliberately indifferent training and supervision provided by Defendant County and Sheriff Provero resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to these defendants and were moving forces in the constitutional and federal violation injuries complained of herein.

114.    As a direct and proximate result of this unlawful conduct, Plaintiff has suffered physical, psychological, and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

115.    As a further result of the named defendants' unlawful conduct, plaintiff has incurred special damages, including medically related expenses and may continue to incur further medical or other special damages, in amounts to be established at a jury trial.

116.    The actions of each and all of the defendants described herein shock the conscience of a reasonable person, and therefore an award of punitive damages is appropriate to punish the defendants for their conduct.

117.    As a result, the plaintiff should be granted an award of compensatory and punitive damages in an amount to be determined at a jury trial of the issues raised herein.

118.    Plaintiff is further entitled to attorney's fees and costs pursuant to 42 USC § 1988, pre-judgment interest and costs as allowable by federal law.

## V.  REQUEST FOR RELIEF

WHEREFORE, plaintiff prays that this Court enter judgment in his favor and against each of the defendants and grant:

(a)  compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(b)  economic losses on all claims allowed by law;

(c)  special damages in an amount to be determined at trial;

(d)  attorney's fees and costs associated with this action under 42 USC § 1988, including expert witness fees, on all claims allowed by law;

(e)  pre- and post-judgment interest at the lawful rate; and

(f)  any further relief that this Court deems just and proper, and any other appropriate relief at law and equity.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

Respectfully submitted this 7th day of August, 2018.

s/ David M. Abbatoy, Jr.

_____

David M. Abbatoy, Jr., Esq.
THE ABBATOY LAW FIRM, PLLC
45 Exchange Blvd., Suite 925
Rochester, New York 14614
Tel: 585.348.8081
Email: dma@abbatoy.com
